1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**
                          **DISTRICT OF NEVADA**
7                           **RENO, NEVADA**

8
CYNTHIA JEAN GOFF as          )        3:03-CV-0690-ECR-RAM
9 administrator of the estate  )
of Lawrence J. Torango,        )
10                             )
         Plaintiff,            )        **ORDER**
11                             )
vs.                            )
12                             )
HARRAH'S OPERATING COMPANY,    )
13 INC., HARVEY'S TAHOE         )
MANAGEMENT COMPANY, INC.,      )
14 HARRAH'S LAUGHLIN, INC.,     )
ARISTOCRAT LEISURE LIMITED,    )
15 ARISTOCRAT TECHNOLOGIES, INC.,)
AND INTERNATIONAL GAME         )
16 TECHNOLOGY,                  )
                               )
17         Defendants.          )
_____)
18

19      Plaintiff Cynthia Goff, as the administrator of the estate of

20 Lawrence J. Torango, (hereinafter "Goff" or "Plaintiff") and

21 Defendants Harrah's Operating Company, Inc., Harveys Tahoe

22 Management Company, Inc., Harrah's Laughlin, Inc., Aristocrat

23 Leisure Limited, Aristocrat Tehcnologies Australia Pty. Limited,

24 Aristocrat Technologies, Inc., and International Game Technology

25 (hereinafter "Defendants") filed a Joint Claim Construction and

26 Prehearing Statement (#87) on January 4, 2005.  Plaintiff and

27 Defendants both filed their opening briefs (##97, 89) on January

28 25, 2005, and responses (## 101, 100) on February 18, 2005.  In

addition, Defendants filed a Motion for Summary Judgment (#189) on September 10, 2005, which Plaintiff opposed (#192) on October 11, 2005.  Plaintiff filed a cross-motion for summary judgment (#193) on October 11, 2005, which Defendants opposed (#195) on October 24, 2005.  Defendants replied (#194) to Plaintiff's Opposition (#192) on October 24, 2005.

A hearing was held on the Summary Judgment motions and the Claim Construction issues on November 9, 2005.

For the reasons stated below, Defendants' motion (#189) will be denied and Plaintiff's cross-motion (#193) will be granted.  The claims will be construed as set forth below.

**I.    BACKGROUND**

Plaintiff alleges that Defendants have infringed Claims 11 and 12 of U.S. Patent 6,592,460 (hereinafter "'460" or "the invention" or "the patent").  The patent, which was issued to the now-deceased Mr. Torango on July 15, 2003, provides a complex system for gaming devices to award progressive prizes.  The infringement claims stem from Plaintiff's over-arching claims that Defendants misused secret elements of the patent, while the patent was pending, in order to create their own progressive gaming systems.

The patent was developed to allow multiple devices, accepting multiple forms of currencies, to link together to share in progressive prize awards.  ('460 Patent Abstract.)  The patent has 17 claims.  Only the meanings of terms in Claim 11 are presently in dispute by the parties.

2

The summary judgment motions center on the issue of whether the meaning of one of the disputed terms is indefinite, thereby rendering the patent invalid.  Thus, in order to address the summary judgment issue, we must first conduct claim construction analysis for that disputed term.

**II.   DISCUSSION**

**A.   Claim Construction Analysis**

The first step when analyzing both invalidity and infringement is claim construction.  Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1351 (Fed. Cir. 2001).  "Only when a claim is properly understood can a determination be made whether the claim "reads on" an accused device or method, or whether the prior art anticipates and/or renders obvious the claimed invention."  Id. Claim construction is a question of law reserved for the court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 384 (1996).

In construing a claim term, we are to give it the "ordinary and customary meaning" as that "term would have to a person of ordinary skill in the art in question at the time of the invention."  Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (citations omitted).  How a court is to determine the understandings of such a person is not entirely clear.  While the opinions of actual persons of ordinary skill may be considered through expert testimony, such evidence is considered extrinsic and of secondary consideration to our inquiry.  Id. at 1317-18. Although the Phillips court does not address this seeming

3

contradiction, it does provide a framework for determining the above-described ordinary and customary meaning.

First, _Phillips_ notes that sometimes the ordinary meaning of a term to one skilled in the art is "readily apparent even to lay judges." _Id._ at 1314.  However, _Phillips_ does not provide examples of what such a readily apparent meaning may be.  For terms whose meanings are not readily apparent, _Phillips_ advises:

> the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.  Those sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."

_Id._ (citations omitted).  The first three categories (claims, specification, and prosecution history) are considered intrinsic evidence, while everything existing outside of the patent and its history is considered extrinsic evidence.  _Vitronics Corp. v Conceptronics, Inc._, 90 F.3d 1576, 1582, 1584 (Fed. Cir 1986).

_Phillips_ stops short of providing a clear-cut order of consideration for the above forms of evidence.  _See_, 415 F.3d at 1324 ("The sequence of steps used by the judge in consulting various sources is not important").  However, _Phillips_ does alert trial courts to the "appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law."  _Id._

Of primary importance to discerning a term's meaning is the language of the claims themselves and the specification, of which the claims are an integral part.  _Id._ at 1312.  "In light of the

4

statutory directive that the inventor provide a 'full' and 'exact' description of the claimed invention, the specification necessarily informs the proper construction of the claims." Id. at 1316.  As stated by Phillips,

> [u]ltimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Id. As examples of how one may consider the text of claims for determining term meanings, Phillips points to the terms' context, usage in other claims, and differences of usage, particularly in dependent and independent claims.  Id. at 1314-15.

The prosecution history of the patent, although considered intrinsic evidence and useful to the claim construction inquiry, is accorded slightly less weight by the Phillips court.  Id. at 1317 ("[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.").

Finally, extrinsic evidence, which "can shed useful light on the relevant art," is considered "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" Id at 1317 (citations omitted).  Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony,

5

dictionaries, and learned treatises." <u>Id.</u>  The <u>Phillips</u> court emphasized in particular that dictionaries, while potentially useful to the analysis, were not to be accorded more authority than intrinsic evidence in claim construction inquires.  <u>Id.</u> at 1318-21.

**A.  The Language of Claim 11**

The disputed terms are found in Claim 11, which follows:

11.  A method of awarding a progressive prize, **comprising:**

    (A) defining **a prize winning number;**

    (B) **determining** a **total wager amount** for a **progressive prize;**

    (C) allowing a player to place a **wager,** the wager having an amount;

    (D) computing the **odds** of a handle pull generating a prize award event using the total wager amount and the amount of the wager, the **odds having a range of outcomes,** the prize winning number being within the range of outcomes;

    (E) generating a random number within the range of outcomes;

    (F) comparing the generated random number to the prize winning number; and

    (G) awarding the progressive prize to the player if the generated random number is **substantially equal** to the prize winning number.

6

**1. Comprising**

Plaintiff proposes that the term "comprising" should be construed to mean "including at least the steps of." Defendants propose that "comprising" should mean simply "including."

The open-ended meaning of "comprising" is well-established in the Federal Circuit. <u>See, e.g.</u>, <u>Mars, Inc. v. H.J. Heinz Co, LLP</u>, 377 F.3d 1369, 1375-76 (2004) ("The transitional term 'comprising' . . . is open-ended and does not exclude additional, unrecited elements or method steps." (quoting Manual of Patent Examining Procedure 8th ed., rev. 1 § 2111.03 (2003))); <u>Genentech v. Chiron Corp.</u>, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.")

Thus, we adopt Plaintiffs' proposed construction of "comprising," meaning "including at least the steps of."

**2. Step (A): "A Prize Winning Number"[1]**

Defendants urge us to limit "a prize winning number" to mean a singular number, specifically the number 1. (Def. Br. at 12-13.) Plaintiff claims that "a" has an open-ended meaning of "one or more." (Pl. Resp. at 4.)

---

[1] The term, "defining" was not among the terms highlighted by the parties for construction, although it was addressed somewhat in the briefings and hearing. The parties essentially agree on the meaning of "defining" as "setting" or "fixing" or "making distinct," and we do not address it further here.

In cases addressing the meaning of "a," especially within claims involving "comprising," the Federal Circuit has recommended an open-ended interpretation, unless a specific limitation or evidence of intent to limit is found in the claims. <u>Scanner Tech. Corp. v. ICOS Vision Systems Corp., N.V.</u>, 365 F.3d 1299, 1304-06 (Fed. Cir. 2004). We have not found such an intent to limit in the specification. Occasionally the claims refer to "the" prize winning number, but that occurs in the claims only after an immediate reference to "a" prize winning number, which implies that "the" refers to the number of the previous reference, but not that the number must be singular.

There are references in the specification to multiple prizes and winners, which provide some basis to allow for the existence of multiple prize winning numbers as well. For example, the Summary of the Invention describes a system for linking game devices to "a plurality of progressive prizes," and states that one of the objectives of the invention is to allow players "to share in the possibility of winning common progressive prizes." ('460 Patent, col. 4:42-46, 20-24.) In addition, the summary states that "the method enables the system to randomly select one or more of the current participants as a winner." (<u>Id.</u>, col. 4:37-38.)

However, multiple winners and prizes are not necessarily equivalent to multiple prize winning numbers. The multiple winners and prizes could be linked to one specific number that occurs in the system more than once. Therefore, the real inquiry remains whether the specification in any way limits the meaning of "prize winning number." Defendants' proffered evidence in support of

8

1  finding that "a" must be singular is not convincing.  First,

2  Defendants find only one potential reference in the specification

3  outside the claims: the use of the word "the."  This usage appears

4  to apply to a device's generated number, not a prize winning

5  number, the reference to which in their example contains the

6  article "a."  (Id. col 16:43-45 ("If the number produced was equal

7  to a predefined number, such as the number one ('1'), then the

8  prize award process would start."))

9      Next, Defendants claim that the number must be the number 1

10 because the odds have not been calculated yet, and the number must

11 be within the range of odds, and 1 is the only number that could

12 anticipate all odds.  We disagree with Defendants that the

13 potential prize winning number must be the number 1.  First, the

14 specification never states that the prize winning number must be

15 the number 1, but merely provides it as an example.  The use of the

16 term "such as" lends more support to an inference that other

17 numbers are possible, than it confines the prize winning number to

18 being the number 1.  In addition, the specification provides

19 examples of "win numbers" being numbers other than 1.[2]  Furthermore

20 as discussed below, we are not convinced that the prize winning

21 number must be determined before the odds are determined, or that

22 the number one is guaranteed to fall within such a range of

23 numbers, and Defendants' argument thus fails on those grounds as

24 well.

25

26     [2]To what extent "win numbers" are distinct from prize winning
   numbers is not entirely clear from the specification, but the
27 similarity of the terms makes the reference worth noting.

28                                    9

The specification does not provide a clear indication of how many prize winning numbers are envisioned by the inventor. As stated by the Federal Circuit, "unless the claim is specific as to the number of elements, the article 'a' receives a singular interpretation only in rare circumstances when the patentee evinces a clear intent to so limit the article." Id. at 1304. Because we have not found evidence of an intent to limit the amount of prize winning numbers in the specification, we do not import any quantitative limitation onto Step (A). Thus, we find that "a" means "one or more."

**3.  Step (B): "Determining"**

Defendants claim that "determining," as used in Step (B), means "receiving a total wager amount from the central system and storing it in memory." (Def. Resp. at 4.) Plaintiff claims that "determining" means "fixing," "deciding upon," and "set[ting] to a desired amount needed to finance the average prize value . . . without regard to the mathematical exact combinations or pay tables of any of the linked gaming devices." (Pl. Br. at 21.) Plaintiff uses the terms "fixing," "deciding upon," and "setting," interchangeably.

Defendants primarily contend that "determining" must include "receiving and storing," because they claim that the fact that an amount is received and stored is what is special about the patent and Claim 11, and Step (B) should be the appropriate place for that to happen. (Def. Resp. at 5-7.) Defendants' authority for this proposition comes from the prosecution history wherein the

10

applicant distinguished Patent '460 from prior art by stating "the function being claimed in Claim 11 for the central system is the ability to record a total wager amount for a progressive prize." (Def. Br. Appendix, tab. 8 at 141.)  However, the claim being addressed by that particular statement was the prior claim 11 of the application, which later became Claim 8 in the actual '460 patent, once claims 1-3 were removed.  Indeed, Claim 8, step A, does specifically disclose the recording of the total wager amount. ('460 patent, col 23 at 30-31.)  We have not found any reference in the specification of Claim 11 that indicates that storing is a particular characteristic of Claim 11.

Plaintiffs more persuasively contend that receiving and storing capabilities are device-specific, not invention-specific, and are addressed in other claims.  Some devices will store the total wager amount, while others would not need to, and the invention is a system for linking all of those different devices. Devices that store would have a free play apparatus, which is discussed in separate claims, such as Claim 8 (discussed above), Claim 14 ("[t]he method of claim 11 further comprising providing a free play apparatus . . .") and Claim 16 ("[a] free play apparatus . . . comprising . . . (B) at least one processor, the processor being adapted to perform at least the following: (a) store information about a progressive prize, including total wager amount.")  The fact that "storing" is specifically mentioned in other claims, but is not mentioned in Claim 11, supports a finding that "determining" does not encompass the meaning "storing."  See Phillips at 1315 ("the presence of a dependent claim that adds a

particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.")

Because we find that the role of "storing" is not disclosed in Claim 11, and it is disclosed in other claims, and because the specification supports a reading of Claim 11 that would not require the disclosure of "storing," we do not construe the meaning of "determining" to include the role of "storing."  Therefore, we adopt a version of Plaintiff's proposed construction as follows: "determining" means "set[ting] to a desired amount needed to finance the average prize value."[3]

**4.  Step (B): Total Wager Amount**

Both parties characterize the "total wager amount" as "a sum of all wagers made for each prize award."  Where they differ is that Defendants claim the amount should be an actual number "not implicit from or capable of being derived from the hardware and/or software of the gaming device," whereas Plaintiff claims the number can be created by a person or the system in order to meet the needs of various criteria.  (Pl. Resp. at 8.)  In addition, Defendants emphasize that the total wager amount serves as a link between devices and prizes, while Plaintiff argues that linkage may occur, but it should not be a limitation of the claim.  (Pl. Resp. at 7-8.)

The specification supplies a definition for total wager amount:

---

[3]From Plaintiff's three proposed terms, we adopt the one with the simplest and most neutral meaning: setting.

12

> For a progressive prize, this is the theoretical sum of
> all wagers made for each prize award event.  The total
> wager amount must be of a value that will support all the
> criteria for the prize starting value, increment values,
> and any other values generated as a result of
> contribution percents applied against wagers.

('460 Patent, col. 8:10-15.)  When a specification reveals a

special definition for a term, the inventor's lexicography governs.

Phillips at 1316.  Thus, the above definition forms the basis for

our construction.  We now look at the specification and prosecution

history to determine whether the limitations suggested by

Defendants should be adopted as well.

The Background of the Invention portion of the specification

emphasizes that prior art had the wager amount and odds fixed in

the individual devices, thus making any change of those amounts,

for example due to varying market or regulatory conditions, costly

and difficult.  ('460 Patent, col. 3:34-42.)  In contrast, this

invention can use a common total wager amount to link devices with

different fixed or programmable currencies and wagers together in

order to share a progressive prize.  (Id. at col. 3:64-67, col.

5:5-14.)  This process is most clearly explained in the prosecution

history:

> Unlike prior art methods, the preferred embodiment can
> link gaming devices regardless of the wager/odds
> combination because the preferred embodiment utilizes a
> theoretical total wager amount to obtain a maximum
> random number range.  Thus if a player wants to play a
> progressive game, a theoretical total wager amount is
> used, e.g. $10,000,000.  The total wager amount may then
> be divided by the player's wager amount of $2 to obtain
> a maximum random number range of 50,000.  The free play
> apparatus then generates a random number within 50,000
> or the corresponding maximum random number range.  If
> the generated random number matches a predetermined
> prize winning number, then the player is awarded a
> progressive prize.

('460 prosecution history at 136, Def. Hearing Ex. I.)  Thus, an advantage of the instant invention is its ability to link devices with differing odds and wagers by dividing the theoretical total wager amount for each prize award by the individual wagers of the machines to achieve a number range from which a random number can be generated.

The total wager amount's ability to link devices is clearly an important aspect of the invention, as is its status as a theoretical amount, rather than the actual total of wagers bet. However, that does not mean that devices that do have total wager amounts inherent in them cannot be linked to the progressive prizes in this invention, or that those total wager amounts may not be considered somehow in the formulation of the theoretical total wager amount.  The purpose of the invention is to link devices together, some of which may have fixed total wager amounts, through a theoretical total wager amount which may override the fixed ones through a free play apparatus.  This purpose does not preclude using fixed total wager amounts, or the regulatory, industrial, or mechanical limitations that created them, from influencing the setting of theoretical total wager amounts.  Therefore, Plaintiff's proposed construction, which recognizes the diverse considerations going into formulating a total wager amount, is more in line with the specification than Defendants' proposed construction, the adoption of which could unnecessarily preclude the consideration of the hardware or software of a particular device.  Because we are not authorized to read into a claim an element that is not present

14

in the claim itself, <u>McCarty v. Lehigh Val. R. Co.</u>, 160 U.S. 110,
116 (1895), particularly where another construction "most naturally
aligns with the patent's description of the invention," <u>Philips</u>,
415 F.3d at 1316, we reject Defendants' proposed limitation that
the total wager amount must not be implicit from or capable of
being derived from the hardware and/or software of the gaming
device.

However, Defendants' proposed limitation that the total wager
amount must serve as a link between the devices *is* naturally
aligned with the specification, and thus presents more of a
dilemma.  While the total wager amount's linking role is not
mentioned in Claim 11, it is touted as a salient point of the
invention throughout the specification.  (<u>E.g.</u>, '460 Patent, col.
3:46-56, "This invention incorporates [the advantage of linking a
gaming device to a progressive prize without changing the device's
hardware or software] by using the total wager amount as the basis
of linkage between a prize and a gaming device;" <u>id.</u>, col 5:5-10,
"Unlike prior art progressive gaming systems and methods that
control linkage between progressive prizes and game pay lines based
on some representation of a coin of a specific denomination issued
in a specific currency, this invention uses the total wager amount
as a common element shared between progressive prizes and the
linked game pay lines.")  The specification does not discuss any
characteristic or component other than the total wager amount as a
means of linking the devices with the prizes.  Therefore, it is
hard to envision an embodiment of this invention that does not

utilize the total wager amount as the basis of linkage between the devices and prizes.

Finally, while Claim 11 does not specify that the total wager amount is the link, when the role of the total wager amount is isolated within the claim, it appears to be a linking role.  Step (B) provides for determining a total wager amount for a progressive prize.  Steps C and D occur at the individual device level, setting up factors to be considered with the total wager amount in generating a random number for an individual hand pull (Step E), to be compared to the prize's winning number (Step F).  Because the total wager amount provides part of the equation used in generating the random number, and because the wager is discussed by the specification as being potentially device-specific, and is put forth in the claims at the device level, the role of the total wager amount as the link between the device and a particular prize is implicitly provided in Claim 11.  Thus, the meaning of the total wager amount should include its role as *a* link between devices and prizes.  However, we do not see the need to limit that meaning to be *the only* link between devices and prizes.

Therefore, we adopt the following construction of total wager amount as used in Step (B) of Claim 11:

> The theoretical sum of all wagers made for each prize award event.  The total wager amount must be of a value that will support all the criteria for the prize starting value, increment values, and any other values generated as a result of contribution percents applied against wagers.  The total wager amount serves as a link between devices and a progressive prize.

16

**5. Step (B): Progressive Prize**

The specification provides a definition for "progressive prize": "A prize that starts at some value then is incremented as wagers are placed on gaming devices linked to the prize. The increment value is the result of multiplying the value of the wagers made by a contribution percentage." (Col. 7 at 50-53.) Both parties adopt this construction, however, Defendants propose to limit the meaning to one singular progressive prize, and suggest defining "increment value" as the "difference between the prize's starting value and the prize's current value."

Defendants' proposal to limit "progressive prize" to one single prize shadows their proposal and our discussion of "a prize winning number" above. First, as discussed above, the caselaw cautions against imposing a singular limitation on the article "a." See Scanner Tech. Corp. v. ICOS Vision Systems Corp., N.V., 365 F.3d 1299, 1304-06 (Fed. Cir. 2004). Defendants counter that undue emphasis should not be placed on the article "a," as Claim 11's references to "a progressive prize" in the preamble and Step (B) mutate into "the progressive prize" in Step (G). However, the term that we are called upon to construe is that attached to the total wager amount determined in Step (B). While the use of "the" in Step (G) may shed some light on its meaning in other steps, it does not negate any inferences contained in the prior uses of "a." As argued by Plaintiff, the use of "the" indicates that Step (G) is merely referring to the progressive prize described in Step (B), not that the prize must be singular. We adopt that reasoning as the most plausible interpretation of the use of different articles

17

modifying "progressive prize" in Claim 11, and focus our construction on the use of the open-ended "a" in Step (B).

Second, there are several references to multiple progressive prizes in the specification.  (See, '460 Patent, col. 4 throughout.)  Indeed, in a discussion of the Free Play apparatus, the preferred embodiment provides a selection button to choose from multiple prizes. (Id. col. 15:63 - col. 16: 2.)  The specification even allows for more than one winner for a prize.  (Id. col. 4:36-38.)

In her argument against a singular limitation, Plaintiff suggests that a prize could be a valuable object plus a variable monetary amount, or a choice between different prizes.  While the specification's references to multiple prizes and winners stop short of expressly providing for the possibility of multiple prizes attaching to a particular total wager amount or a handle pull, we have not found any language in the specification that would rule out this possibility.  Thus, we find no basis to limit the meaning of "a progressive prize" to a singular prize.

In addition, we do not find sufficient basis at this time to limit the meaning of "increment value" to the "difference between the prize's starting value and the prize's current value." Although Defendants argued for such a limitation in their briefing, they did not so argue at the hearing, and the succinct arguments in their brief were not persuasive, as they primarily relied on expert testimony merely claiming that the ordinary meaning was such.  In addition, it is not obvious that Defendants' proposal is easily reconciled with the specification's definition and usage of

1   "increment value."  The specification's definition, although less

2   than crystal clear, does provide that "the increment value is the

3   result of multiplying the value of the wagers made by a

4   contribution percentage." ('460 Patent, col. 7:51-53.)  In

5   addition, the specification describes the use of a "prior increment

6   value" within the equation for calculating current prize values.

7   (<u>Id.</u> at col. 19:18-38.)  In that equation, the prior increment

8   value is added to the minimum prize amount, and that sum is added

9   to a figure that is the result of the multiplication of accumulated

10  wagers with a particular exchange rate, increment percent, and

11  surcharge percent.  (<u>Id.</u>)  The multiplied portion of the equation

12  appears to be a more detailed version of "the result of multiplying

13  the value of the wagers made by a contribution percent," put forth

14  as the definition of the increment value in the specification as

15  described above.  While these equations from the specification may

16  be compatible with Defendants' proposed definition of increment

17  value, without more compelling evidence in support of how they are

18  compatible, we are not persuaded that it should be adopted as a

19  limitation.

20      Therefore we adopt the definition of progressive prize put

21  forth in the specification at col. 7:50-53, without any of the

22  limitations proposed by defendants.

23

24  **6.  Step (C): Wager**

25      Plaintiff suggests that "wager" should mean "bet" and provide

26  a dictionary definition for wager: "something (as a sum of money)

27  that is risked on an uncertain event." (Pl. Br. at 22, citing

28                                    19

Webster's, Ex. B.)  Defendants argue in their Brief that the meaning of "wager" should be limited to a "specific sum of money." (Def. Br. at 21.)  Defendants did not allocate much of their time in the hearing to the meaning of "wager," except beyond indicating it should be a monetary amount.  Plaintiff did not dispute this argument at the hearing and even proposed that the term "wager having an amount" means "a wager having a numerical currency value."

There is no support in the specification to limit the meaning of "wager" to a "specific sum of money," and indeed, a great deal of support for the proposition that diverse wager amounts are allowed for in the invention.  While the preferred embodiment does refer to the "wager amount of a specific bet," this appears to have a distinct meaning from "specific sum of money," namely that an individual bet has a specific amount, but other amounts for other wagers are anticipated.  Defining "wager" to mean "a specific sum of money" could limit the invention to allowing only one kind of wager – an unsupported outcome that would destroy the invention's distinction from prior art and invalidate the patent.

However, the parties apparently agree that "wager" involves monetary value.  Nevertheless, neither party points to a definition or a means of understanding the term from the specification which we could adopt as a clear definition.  Given the lack of limitation presented by the specification and the fact that the extrinsic dictionary definition provided by Plaintiff does not appear to contradict the specification's usage of the term "wager," we adopt the dictionary definition presented by Plaintiff.

**7.   Step (D): Odds Having a Range of Outcomes**

We find that the meanings of the terms "odds" and "odds having a range of outcomes" are inter-dependent, and thus we will address them together in this section.

Defendants suggest that "odds" means: "the inverse of the probability of winning a particular progressive prize."  (Def. Resp. at 11.)  For example, if the probability is 1/1000, the inverse probability is a single number, 1000.  Plaintiff suggests that "odds" means "the ratio of two [undefined] numbers."  (Pl. Resp. at 17.)  In the Joint Claim Construction and Pre-Hearing Statement (#87), Plaintiff's proposed construction of "odds" is "the ratio of the probability of a progressive award event occurring to that of a non-progressive prize award event occurring."

We first look to the claim terms for guidance for construing the meaning of "odds."  See Phillips, 415 F.3d at 1312; Vitronics, 90 F.3d at 1582.  In the case of "odds," Steps (D) and (E) provide substantial guidance:

> (D) computing the odds of a handle pull generating a prize award event using the total wager amount and the amount of the wager, the odds having a range of outcomes, the prize winning number being within the range of outcomes;
> (E) generating a random number within the range of outcomes;

First, Step (D) describes computing odds by using the total wager amount and the amount of the wager.  However, the step does not indicate exactly how those amounts should be used to compute the odds, and we must look to the specification for guidance in

21

that capacity.  Nevertheless, the rest of the steps provide
guidance as to the purpose of the odds.

When read by itself, the phrase, "the odds having a range of
outcomes," could mean that there are a range of outcomes for the
odds.  If this meaning were to be adopted, we still would not know
whether the outcome was intended to be a single number or a ratio.
However, when examined in conjunction with step (E) of Claim 11, we
see the phrase, "generating a random number within the range of
outcomes."  With this phrase in mind, a more sensible reading of
"the odds having a range of outcomes" would be "the odds providing
a range of outcomes to be used to generate the random number."
This construction gives the odds a purpose within the claim:
creating a range of numbers from which the generated random number
is chosen.  Without this purpose for Step (D), there is no other
range of outcomes in the claim from which to generate the random
number.  This purpose provides substantial support for the
proposition that "odds" should be construed to encompass a
relationship between two numbers, as a range cannot exist within
one number alone.

For the most part, this construction is supported by the
specification.  The specification provides an equation "for
creating a set of numbers for the random number generator."  ('460
Patent, col. 16 at 12-13.)  MR = PT/WG, where MR = the maximum
number for the range of random number selection, PT = prize's total
wager amount, and WG = wager made as a multiple of the lowest
monetary unit.  (Id. at 16-24.)  The specification does not
describe this equation as a means for calculating odds, however, it

certainly appears related to the odds calculation and purpose set forth in the claims, as it uses the wager and the total wager amount to create a set of numbers for the random number generator.

In discussing this equation further, the specification states "the computed odds, represented by the maximum number for range of random numbers." Defendants argue that this sentence indicates that the computed odds must be a single number, the inverse of the probability of winning a particular prize. However, such a construction appears to contradict the purpose of odds as set forth in the claims: to provide a range of numbers (outcomes) from which to generate a random number. This poses the question, then, can the odds be "*represented by*" a single number and yet *be* more than one number - or a relationship between numbers - which thus creates a range of numbers.

We find that it can, and that a construction of "odds" as the mathematical relationship of two numbers, wherein the total wager amount is divided by the individual wager, and the resulting figure provides a ratio of two numbers, which in turn provides a range of numbers from which to generate a random number, is the construction most supported by the claim terms, the overall meaning of the specification, and common understandings of the term. While portions of the specification occasionally refer to the odds as a single number, say 14,285,715 (col. 3 at 3 (in discussion of prior art)) we find that such usage can also imply a relationship between two numbers, i.e. 14,285,715 divided by 1. Any other understanding would obfuscate the purpose of the odds: to provide a range of numbers. Indeed, the testimony of both parties' experts did not

provide any basis for a finding that one of ordinary skill would commonly understand the meaning of "odds" to be a single number. Defendants' expert, Mr. Bertram, indicated that such usage was unusual, though not unheard of; and Plaintiff's expert, Mr. Ladner, indicated that such usage would imply a relationship between two numbers, the number provided and one.

We are cognizant that the construction proposed by Defendants is a form of a relationship between two numbers - an inverse probability represented by a single number.  Such a construction does find support in the specification.  However, we find such a construction's emphasis on the singularity of the number, when taken to the extreme, could potentially invalidate the patent by obfuscating the purpose of the odds - creating a range of numbers for random number generation.  In addition, we reject the second portion of Defendants' proposed construction as the specification and claim terms do not discuss "odds" in relation to the probability of winning a prize award, but rather focus on the relationship of the total wager amount and the wager, and the use of these figures for creating a range of numbers.

Nevertheless, Plaintiff's proposals are not more helpful. Plaintiff's first proposed construction is overly broad, as it emphasizes that the numbers are undefined.  While we recognize that a purpose of the invention is to allow for diverse odds and wagers, and we do not want to adopt a construction which would interfere with that purpose, we find that some mention of the claim's parameters for the odds would be helpful.  In addition, Plaintiff's second proposed construction, "the probability of a progressive

24

prize award event occurring . . ." is not clearly supported by the claim terms or the specification.  The odds may relate to the probability of winning, but the specification does not discuss this enough to warrant its inclusion as a limitation of the claim.

However, the Plaintiff's use of the term "ratio," while not used specifically in the specification, does support the meaning of the equation discussed above, wherein one figure is divided by another.  Use of the term, "ratio" is well-supported by extrinsic evidence.  One dictionary definition of "odds" is "[t]he ratio of the probability of an event's occurring to the probability of its not occurring."  The American Heritage Dictionary (4th Ed. 2004).  In turn, a dictionary definition of ratio is: "The relation between two quantities expressed as the quotient of one divided by the other."  Id.  Because such a meaning is not contradicted by the specification (even a singular number is a ratio between that number and one), our seeking guidance from this extrinsic evidence is appropriate.  See Phillips, 415 F.3d at 1317-18.  Therefore, we adopt the following construction for "odds":  a ratio of two numbers, represented by the total wager amount divided by an individual wager, creating a range from which a random number may be generated.

## 8.  Substantially Equal

Step (G) of Claim 11 provides: "awarding the progressive prize to the player if the generated random number is substantially equal to the prize winning number."

1    Defendants claim that the meaning of "substantially equal" is
2    undefined in the patent, and hence indefinite.  Plaintiffs suggest
3    that "substantially equal," as used in the claim, means "equal."
4    If Defendants are correct that the meaning of "substantially equal"
5    is indefinite, then the claim would be invalid, and their motion
6    for summary judgment should be granted.  See 35 U.S.C. 112 ("The
7    specification shall conclude with one or more claims particularly
8    pointing out and distinctly claiming the subject matter which the
9    applicant regards as his invention."); Seattle Box Co., Inc. v.
10   Indust. Crating & Packaging, Inc., 731 F.2d 818, 826 (Fed. Cir.
11   1984).

12   Rejecting "a broad concept of indefiniteness, [wherein] all
13   but the clearest claim construction issues could be regarded as
14   giving rise to invalidating indefiniteness in the claims at issue,"
15   the Federal Circuit has created the following standard for
16   assessing indefiniteness: "If one skilled in the art would
17   understand the bounds of the claim when read in light of the
18   specification, then the claim satisfies section 112."  Exxon
19   Research & Eng'g Co. v. U.S., 265 F.3d 1371, 1375 (Fed. Cir. 2001).
20   Noting the complexity of the inquiry, the Exxon court stressed that
21   '[i]n determining whether that standard is met, i.e., whether 'the
22   claims at issue are sufficiently precise to permit a potential
23   competitor to determine whether or not he is infringing,' we have
24   not held that a claim is indefinite merely because it poses a
25   difficult issue of claim construction."  Id. (internal citation
26   omitted).  "If the meaning of the claim is discernible, even though
27   the task may be formidable and the conclusion may be one over which

28
                                  26

reasonable persons will disagree, we have held the claim

sufficiently clear to avoid invalidity on indefiniteness grounds."

Id.  Once a patent has been issued by the PTO, it possesses a

presumption of validity, and a challenging party must present clear

and convincing evidence to overcome that presumption.  Datamize,

LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347-48 (Fed. Cir.

2005).

When faced with a similar allegation that the use of the term

"substantially equal" rendered a claim indefinite, the Federal

Circuit emphasized the need to determine whether the specification

provides a standard for measuring the degree of equality

encompassed by the term "substantially."  Seattle Box Co., 731 F.2d

at 826 (rejecting indefiniteness where specification identifying

the purpose of a device could support a standard for measuring the

degree needed to be considered); see also Mikowski v. Visi-Trak

Corp. 36 F. Supp. 2d 171, 178 (S.D.N.Y. 1999) ("In this case, it is

clear that the term [of art] "substantially" has been included

merely to bridge the gap between the abstract description of a

method and its practical application in the real world. . . . [and]

adds nothing to the claim.").  An issued patent should not be

invalidated, even where some amount of experimentation is necessary

to determine the degree required, if the claims otherwise enable

the patent.  Exxon Research, 265 F.3d at 1379 (also distinguishing

another "substantially" case involving patent application, as

opposed to issued patent, and where determining precise degree was

critical to invention); Seattle Box Co., 731 F.2d at 826.

1    Here the specification provides some minimal basis for

2   determining what degree of equality is required.  In the portions

3   of the specification addressing the matching of the random number

4   to the prize winning number, it states that the numbers must be

5   equal.  ('460 patent, col. 23:50-51, col. 16:43-45.)  Although the

6   only time the term "substantially equal" is used outside the claims

7   is in connection with total wager amounts, its use in that passage

8   provides some guidance for the meaning of the term and how a person

9   of ordinary skill would understand the term in order to avoid

10  infringement.[4]  (Id. at col. 12:66 - col. 13:2 ("From the

11  regulatory viewpoint, these checks ensure that the theoretical

12  total wager amounts are substantially equal.")

13   The purpose of the patent is to link international gaming

14  devices with diverse regulatory standards and currency

15  fluctuations.  The numbers are generated by mathematical formulas

16  which include multiplying incremental and surcharge percentages of

17  such minimal size as .00000415979493 (id. at col. 14:26),

18  indicating that some devices may not present exact integer matches.

19  Furthermore, different devices in different zones may have

20  different regulatory standards requiring different exactitude in

21  matches.  A person of ordinary skill in the art should be able to

22  engage in some amount of experimentation with these standards and

23  percentages in order to determine what degree of equality is

24  required between the random generated number and the prize winning

25

26      [4]We reject Defendants' argument that because "substantially
    equal" is used elsewhere in the specification, Mr. Torango should have
27  used it in the portion describing the random number comparison, and
    since he did not, the term is indefinite.

28                                    28

1  number in order to produce an effective match while meeting the

2  regulatory standards.  The fact that the specification does not

3  specify this degree is not fatal, given the presumption of validity

4  attached to this issued patent and the fact that the patent does

5  not indicate that the precise degree of equality is critical to the

6  invention.  See Exxon Research, 265 F.3d at 1379.

7        Thus, we find that the use of the term "substantially equal"

8  does not render Claim 11 indefinite and summary judgment should not

9  be rendered in favor of Defendants on that basis.  Furthermore, we

10  construe the term "substantially equal" to mean "equal to the

11  extent that diverse regulatory standards and currencies are applied

12  and the purpose of the invention is enabled."

13

14  **9.  Order of Steps**

15        Plaintiff argues that no specific order should be attributed

16  to the steps of Claim 11.  Defendants argue that the steps should

17  be limited to the order in which they are written.  According to

18  the Federal Circuit:

19        First, we look to the claim language to determine if, as
         a matter of logic or grammar, [the steps] must be
20        performed in the order written.  For example . . . we
         [have] held that the claim language itself indicated that
21        the steps had to be performed in their written order
         because the second step required the alignment of a
22        second structure with a first structure formed by the
         prior step.

23

24  Altiris, Inc. v. Semantec Corp., 318 F.3d 1363, 1369-70 (Fed.

25  Cir. 2003) (internal citation omitted).

26        In applying the above analysis, we find that Step (D) is

27  dependent on Steps (B) and (C)'s having already occurred; and

28                                    29

that Steps (E), (F), and (G) necessarily must occur in order after Step (D); and that Step (A) may come after Steps (B), (C), and possibly even (D) and (E), but in any case, must come before (F) and (G).

Step (A) provides "defining a prize winning number." Step (D) contains the phrase, "the prize winning number being within the range of outcomes."  As discussed above, the range of outcomes is the range from which a random number will be generated, to be ultimately compared to the prize winning number.  The parties have not convinced us that the prize winning number must be determined prior to the creation of the range of numbers from which the random number is generated. The use of the gerund "being," in the phrase "the prize winning number being within the range of outcomes," without a participle indicating past, present, or future, does not itself dictate when the prize winning number is determined. In addition, it is certainly plausible that the range of numbers is best created prior to the determination of the prize winning number, in order to ensure that the prize winning number is within the range.  Given that the only mandates for setting the range of numbers are that the total wager amount and the wager are used, the pre-determination of the prize winning number appears unnecessary for that calculation, and could even interfere with the ultimate workings of the invention.

Similarly, Step (A) need not come before Step (E), as (E) only calls for generating a random number withing the range of outcomes.  While Defendants point to the portion of the specification comparing the random generated number to "a predefined number" ('460 Patent, col. 16:43-45) as support for their argument that Step (A) must come before Step (E), we find this passage to only indicate that the number must be defined prior to the comparison occurring in Step (F) and not prior to the generation of the random number in Step (E). Thus, we find that Step A may occur at any step prior to Step (F).

We further find that Step (B) (determining a total wager amount) and Step (C) (placing a wager) must come before Step (D) as those figures are necessary to calculate the range of numbers as provided in Step (D).

Finally, we find that Step (F) must come after Steps (A)-(D) as the completion of those steps are necessary to Step (F), and that Step (G) must come after Step (F) and the other steps for the same reason.

Therefore, we find that the following order of steps is required by the patent: (B) and (C) must occur before (D), but the two may be performed in either order or simultaneously. (D) must occur before (E), (F), and (G).  (A) may occur at any time before (F). (E) must occur after (D) and before (F) and (G).  (F) must occur after (D), (E), and (A) and before (G). (G) must occur after (F) and all of the other steps.

31

1    **IT IS, THEREFORE, HEREBY ORDERED** that Defendants' Motion
2    for Summary Judgment (#189) is **DENIED**.  The '460 patent is not
3    invalid for indefiniteness, as set forth above.

4
5        **IT IS, FURTHER, HEREBY ORDERED** that Plaintiff's Motion
6    for Summary Judgment (#193) is **GRANTED**.  The '460 patent is
7    not invalid for indefiniteness, as set forth above.
8
9
10       **IT IS, FURTHER, HEREBY ORDERED** that, the disputed claim
11   terms are to be construed as set forth above.
12
13   DATED: This 30th day of December, 2005.
14
15
16
17   _____
18                         UNITED STATES DISTRICT JUDGE
19
20
21
22
23
24
25
26
27
28                         32